# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 21-0850V

|  |  |
|---|---|
| IVAN BOYD,<br><br>                    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: October 8, 2024 |

*Ronald Craig Homer, Conway, Homer, P.C., Boston, MA, for Petitioner.*

*Tyler King, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION AWARDING DAMAGES[1]

On February 3, 2021, Ivan Boyd filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that that he suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on December 12, 2019. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"), and although entitlement was conceded, the parties could not agree on the proper amount of damages to be awarded.

For the reasons set forth below, I find that Petitioner is entitled to a damages award of **$90,000.00 for actual pain and suffering.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website , and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I.    Relevant Procedural History

Over a year after the case was activated, Respondent conceded that Petitioner was entitled to compensation, and the parties began negotiating damages (ECF Nos. 34-36). However, they soon reached an impasse (ECF No. 48). On October 24, 2023, Petitioner filed a memorandum in support of damages (ECF No. 54). Respondent reacted, and Petitioner replied (ECF Nos. 57, 62). The matter of damages is now ripe for resolution.

## II.    Relevant Medical History

On December 12, 2019, Petitioner (an inmate at Redgranite Correctional Facility in Wisconsin) received a flu vaccine in his right deltoid. Ex. 1 at 1; Ex. 7. Later that day, he was seen by a nurse complaining of right arm pain.[3] Ex. 2 at 802. He described a "burning pain down to my elbow" since his vaccination, and rated it as five out of ten. *Id.* at 803. On examination, both shoulders had normal range of motion ("ROM"). *Id.* at 806. Petitioner was reassured that muscle soreness after an intramuscular injection was normal and should resolve within a day or two, and that he could massage the area or use cool compresses for pain relief.[4] *Id.*

The next day (December 13, 2019), Petitioner submitted a Health Service Request form ("HSR").[5] Ex. 2 at 3052. He explained that since his vaccination, his right arm had burned and ached at the injection site, and hurt when he extended it. *Id.* A nurse responded that soreness lasting up to a week was normal. *Id.* Two days later (December 15th), Petitioner submitted another HSR, this time addressed to the manager of the health

---

[3] This record documents *left* arm pain and states that Petitioner's pain was related to a flu vaccination in his *left* arm. Ex. 2 at 802, 806. The record further states that Petitioner had "left arm inside his shirt and is holding it with left sleeve of shirt hanging free." *Id.* at 806. All other treatment records, however, indicate that Petitioner reported *right* arm pain from a flu vaccine in his right arm, and Respondent has agreed that the references to Petitioner's left arm in this record appear to be an error. Respondent's Response at *2 n.1 (ECF No. 57).

[4] Petitioner states that over-the-counter pain medication was dispensed on that date, citing Ex. 2 at 3042. The page Petitioner cites is a medication request dated December 28, 2019, not December 12th – but this small discrepancy does not bear on damages calculations. Ex. 2 at 3042.

[5] Petitioner states that the December 13th HSR is located at Ex. 2 at 3040-41 (Mem. at *2); however, it is actually in Ex. 2 at 3052. Petitioner's damages memorandum has several other citations that are similarly slightly incorrect. Although Exhibit 2 contains over 3,000 pages spread out over eight volumes, with no exhibit list or docket text detailing the pages included within each volume, I have attempted to locate records cited by Petitioner even when the citations were inaccurate. However, in some cases the information in Petitioner's brief was not sufficiently detailed to determine what document he referred to. For instance, Petitioner states that after January 7, 2020 he "continued to report his right arm pain to the HSU," citing Ex. 2 at 1196-1197. Mem. at *4. Exhibit 2 at 1196-1197 contains lab results that are not related to Petitioner's arm pain, and it is not clear what records Petitioner intended to cite.

services unit. *Id.* at 3051. He stated that since his December 12th vaccination he had been experiencing "severe pain and burning in my right arm," and inquired if pain continuing up to a week was normal. *Id.* A different nurse responded that stiffness and an achy feeling for a short time was normal. *Id.*

On December 16, 2019, Petitioner was seen for a nurse sick call for vaccine-related right arm pain that he rated as seven out of ten. Ex. 2 at 799, 800. On examination, his right shoulder now displayed a slight decrease in ROM and limited strength. *Id.* at 801-02. He was given pain medication and advised to try warm compresses. *Id.* at 802. Two days later (December 18, 2019), Petitioner submitted an HSR stating that he continued to suffer "extreme pain and burning in my right arm and hand," and now had limited movement in his right arm and hand, causing problems getting into his upper bunk. *Id.* at 3049.

Petitioner was seen by a nurse on December 19, 2019, complaining of pain he rated as nine out of ten. Ex. 2 at 798. He described a radiating and shooting pain from his shoulder to his elbow. *Id.* at 799. He was given a sling and encouraged to use Tylenol more often. *Id.* That night, he lost his grip and fell from his top bunk while trying to get into bed. *Id.* at 797, 1078. The nurse who responded found Petitioner unable to move his head or back, and he complained of back and neck pain that he rated as ten out of ten. *Id.* at 797. The nurse placed him in a cervical collar and called an ambulance. *Id.* He was evaluated in the emergency department and discharged back to Redgranite Correctional Institution. *Id.* at 1078-1127.

A week later (December 26, 2019), Petitioner submitted an HSR stating that due to his loss of right arm mobility he had fallen again, this time while exiting his top bunk, and hurt his right knee. Ex. 2 at 3044. He saw a nurse the next day for right arm numbness and pain following his vaccination. *Id.* at 729. He was advised that he may have a muscle injury from the vaccination or his fall, and that it would need time to heal. *Id.* at 730. On January 2, 2020, Petitioner was seen at the health services unit for a follow up on his knee and shoulder issues, and was informed that x-rays of both taken that morning were normal. Ex. 2 at 845, 1214.

On January 7, 2020, Petitioner saw a nurse for right arm, hand, and knee pain and weakness. Ex. 2 at 788. He complained of a shooting pain in his right arm and rated his arm pain as eight out of ten "when it occurs." *Id.* at 788, 790. He continued to complain of right arm pain and other concerns in January and February 2020. *Id.* at 3032-37.

On February 26, 2020, Petitioner underwent a physical therapy ("PT") evaluation for right arm weakness after his vaccination and other health concerns. Ex. 2 at 1076. Over the past week, his pain had ranged from zero to seven out of ten. *Id.* He was noted

to have full active ROM in his right arm and good strength except for minor wrist flexor weakness and grip weakness. *Id.* at 1077. A treatment plan was made for Petitioner to attend PT twice a week for two weeks. *Id.* He attended two more sessions, on February 28 and March 2, 2020, and was discharged with instructions to continue exercises independently. *Id.* at 1073-76. At the March 2nd session, the therapist noted that Petitioner "[s]till require[d] verbal cues to do ROM and postural exercises correctly. Compliance issues." *Id.* at 1074.

Petitioner returned to PT a month and a half later (April 15, 2020). Ex. 2 at 1072. He complained of increased pain, stiffness, and weakness in his right shoulder. *Id.* He reported compliance with his home exercise plan, but the therapist noted a history of not knowing his exercises at previous return visits, and noted that Petitioner "only signed in one time of 8 scheduled appoint[ment]s to use PT room for hand wrist exercises as instructed from 3/2/20 to 4/5/20." *Id.* On examination, Petitioner's right shoulder active ROM was now 90 degrees in flexion, 80 degrees in abduction, 56 degrees in external rotation, and 50 degrees in internal rotation.[6] *Id.* at 1073. The therapist noted that Petitioner had continued deltoid pain and had "developed capsular restrictions R shoulder," after having had full ROM in March, and this was "likely due to noncompliance" with his home exercise plan. *Id.* The therapist planned to progress with light strengthening and continue PT twice a week if Petitioner was compliant with ROM and postural exercises. *Id.*

Petitioner returned to PT five days later, on April 20, 2020. Ex. 2 at 1071. He now had full ROM in flexion and abduction, and the therapist noted he had "[p]oor awareness/compliance" with his home exercise plan and "could only remember 3 of 9 exercises given last week." *Id.* The therapist also documented "[e]vidence of symptom magnifications with inconsistency with objective ROM of R shoulder" – in other words, the therapist appears to have thought Petitioner had made his ROM appear much more restricted than it actually was at his appointment five days earlier *Id.* Two days later (April 22nd), a PT record documented Petitioner as a "NO show" after he arrived 15 minutes late. *Id.* at 1070. A corrections officer overheard the therapist and Petitioner discussing why Petitioner was late and told Petitioner to leave "due to disrespect." *Id.* Due to Petitioner's history of noncompliance "and no notable ROM or strength deficits R shoulder as he was displaying on 4/15/20," Petitioner was discharged from PT. *Id.*

On May 26, 2020, Petitioner submitted an HSR requesting to be seen by an outside specialist for possible SIRVA. Ex. 2 at 2997. He was seen by a nurse on June 23, 2020

---

[6] Normal shoulder ROM for adults ranges from 165 to 180 degrees in flexion, 170 to 180 degrees in abduction, 90 to 100 degrees in external rotation, and 70 to 90 degrees in internal rotation. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 80, 84, 88 (F. A. Davis Co., 5th ed. 2016).

for right shoulder pain and weakness. *Id.* at 748. He currently had no pain, with slightly limited ROM and right arm weakness compared to his left arm. *Id.* at 750. His right shoulder was "unremarkable," and he was encouraged to take prescribed medications for pain. *Id.* Two weeks later (July 7, 2020), Petitioner complained of neck, back, and shoulder pain, although he denied any worsening since his last evaluation. *Id.* at 724. He was advised that offsite visits for non-acute conditions were being "scaled way back" due to the COVID-19 Pandemic. *Id.*

On September 16, 2020, Petitioner submitted an HSR to follow up on his right shoulder pain and ROM concerns. Ex. 2 at 2965. Eight days later, he submitted another HSR relating to his shoulder pain and ROM, complaining that it was affecting his daily life and requesting to see an orthopedist or specialist as soon as possible. *Id.* at 2962. He was advised to continue with his plan of care and discuss it with the provider at his appointment tentatively scheduled in November 2020. *Id.*

Petitioner submitted an HSR on October 12, 2020, complaining of "extreme pain and mobility issues" with his right arm and shoulder. Ex. 2 at 2957, 2958. He was advised to discuss it at his nurse appointment tentatively scheduled for the following week. *Id.*

Petitioner saw a nurse practitioner ("NP") on November 23, 2020, for right shoulder pain and to follow up on his diabetes. Ex. 2 at 721. On examination, he had limited ROM in his right shoulder with pain. *Id.* at 722. He was assessed with pain of the right shoulder joint. *Id.* The NP noted that Petitioner could not have an MRI due to metal in his body. *Id.* She ordered an orthopedic referral. *Id.* Petitioner submitted HSRs asking about the orthopedic referral on December 7 and 17, 2020, and was told it had been ordered but not yet scheduled. *Id.* at 2946-47. In February 2021, he was told an orthopedist appointment had been scheduled. *Id.* at 2938.

On April 7, 2021, Petitioner saw Dr. Kira Labby for right shoulder pain since his flu vaccination in late 2019. Ex. 16 at 1. Initially his shoulder was stiff and weak, but now his main complaint was decreased ROM to about 90 degrees each in abduction and forward flexion. *Id.* He is right handed and some daily activities such as brushing teeth were painful and difficult. *Id.* Dr. Labby administered a subacromial steroid injection. *Id.*

Just over a month later (May 13, 2021), Petitioner submitted an HSR stating that he continued to have pain and mobility after the steroid injection, and requesting a referral to orthopedist Dr. Nelson. Ex. 9 at 1325. He was advised to follow his plan of care for bursitis, and advised that he had an appointment tentatively scheduled for a week later. *Id.*

Petitioner was seen by a NP on May 20, 2021 for his ongoing right shoulder pain. Ex. 9 at 17. On examination, he had limited right shoulder ROM with pain. *Id.* at 18. He

was referred for an orthopedist evaluation due to failure of conservative treatment. *Id.* He submitted a HSR on July 21, 2021, asking if he was scheduled to see an orthopedist. Id. at 1311. He was told the orthopedist appointment was being worked on. *Id.* On August 17, 2021, he underwent a right shoulder ultrasound. *Id.* at 235. The ultrasound showed mild arthrosis and mild subcromial/subdeltoid bursitis, with an intact rotator cuff. *Id.*

Petitioner had a telemedicine appointment with orthopedist Dr. Eric Nelson on August 23, 2021. Ex. 9 at 230. Petitioner reported pain and limited motion in his right shoulder "for about 2 years" following a flu vaccination. *Id.* Dr. Nelson noted that Petitioner had diabetes, which is a known risk factor for frozen shoulder. *Id.* Petitioner's shoulder ultrasound showed some evidence of bursitis. *Id.* On examination (conducted remotely via audiovisual telemedicine), Petitioner's right shoulder active ROM in forward flexion and abduction were both about 90 degrees. *Id.* at 231. Dr. Nelson diagnosed Petitioner with chronic frozen shoulder that had failed conservative treatment, and recommended a manipulation under anesthesia ("MUA") followed by more PT. *Id.*

Petitioner underwent a right shoulder MUA on October 8, 2021. Ex. 9 at 222. After the nerve block was administered, Dr. Nelson was "able to fully forward flex the shoulder. There was not a whole lot of stiffness or release of adhesions. A small amount, but his degree of adhesive capsulitis was not particularly severe." *Id.*

Petitioner underwent a PT evaluation five days later (October 13, 2021). Ex. 9 at 210. The record noted that in the February to April 2020 time-period, Petitioner had a history of "compliance issues, symptom magnification and inconsistencies, and disrespect in PT session." *Id.* At the time of evaluation, Petitioner was in a restricted housing unit ("RHU") and in restraints that could not be removed, and thus his ROM could not be measured. *Id.* Petitioner was shown exercises and instructed to do them in his cell three times a day, and the therapist offered to follow up with him the next week at his cell door to confirm awareness of the exercise program. *Id.*

Petitioner was seen for another PT session on October 18, 2021. Ex. 2 at 209. This session was done in the RHU, where the therapist observed him without restraints through his cell door. *Id.* Petitioner needed verbal cues for his home exercise program, leading the therapist to question whether he had been complying with his program. *Id.* at 210. Petitioner demonstrated "fairly good" active ROM, with mild restrictions. *Id.* Petitioner had another PT session the next week (October 25, 2021), again at his cell door. *Id.* at 208. Petitioner stated he was "committed to doing his HEP 2-3 x daily as instructed," although the therapist noted he again needed verbal cues for six out of ten exercises and questioned his compliance. *Id.* At this time, Petitioner was discharged "due to RHU placement," and instructed to contact the therapist once he was out of the RHU and able to more fully participate in PT. *Id.* at 209.

On November 10, 2021, Petitioner saw Dr. Gilbert Steffanides to follow up on his right shoulder and other matters. Ex. 9 at 91. His shoulder ROM was not tested due to restraints. *Id.* He was assessed with adhesive capsulitis and Dr. Steffanides noted that he would follow up with Dr. Nelson. *Id.* Petitioner submitted HSRs on November 22 and 29, 2021 stating that he wanted another cortisone injection. Ex. 9 at 1258, 1261.

Petitioner returned to PT on December 6, 2021. Ex. 9 at 206. He reported pain levels of two out of ten at best, and five at worst. *Id.* at 207. On examination, his active ROM was 140 degrees in flexion, 148 degrees in abduction, 74 degrees in external rotation, and 70 degrees in internal rotation. *Id.* The therapist noted "[c]ompliance issues with HEP [home exercise program]," adding that Petitioner "admits to poor/fair compliance and verbal cues needed to do correctly or remember exercises today." *Id.* There was "[l]ittle overall change [in] ROM." *Id.* Petitioner was assessed with mild rotator cuff tendinitis with ROM deficits. *Id.* Petitioner had two additional PT sessions on December 8 and 13, 2021. *Id.* at 204-206.

On December 13, 2021, Petitioner had a telemedicine appointment with Dr. Nelson. Ex. 9 at 217. Petitioner thought his ROM had improved, but he was still having shoulder pain and requested a cortisone injection. *Id.* He also asked about possible arthroscopic shoulder surgery. *Id.* Dr. Nelson had no concerns with Petitioner receiving another cortisone injection, but did not think there was a reasonable surgical option because Petitioner's shoulder was structurally intact. *Id.* at 217-218. Dr. Nelson noted that surgery for frozen shoulder does not consistently lead to a satisfactory result, sometimes leaving permanent stiffness. *Id.* On the same day, Petitioner submitted an HSR requesting that Dr. Labby to administer another cortisone injection or that he be taken to Dr. Nelson for the injection. *Id.* at 1251.

Petitioner had additional PT sessions on December 15 and 20, 2021. Ex. 9 at 202-204. At his December 20th session, his pain had improved to zero out of ten at best and two to three out of ten at worst. *Id.* at 203. He had improved active ROM (174 degrees in flexion, 165 degrees in abduction, 94 degrees in external rotation, and 76 degrees in internal rotation). *Id.* He was discharged with instructions to continue his home exercise program to address mild overhead deficits that remained. *Id.*

Petitioner received a steroid injection in his right shoulder on January 31, 2022. Ex. 9 at 89. Less than two months later (March 19, 2022), he submitted an HSR, stating that his right shoulder pain had "returned with a vengeance." *Id.* at 1223. He was taking over the counter pain medications and using cream, and though he may need to see an orthopedist again. *Id.* He submitted another HSR nine days later (March 28, 2022), stating that on March 26th the on call nurse had been contacted due to severe pain, and he now needed to go to the hospital or be given stronger medication as the pain was

"unbearable." *Id.* at 1220. Petitioner was seen by a nurse the following day for right shoulder pain that he rated as seven out of ten. *Id.* at 33, 34. The nurse noted that he was able to remove his sweatshirt without difficulty, and lift his arm above his head without grimacing, though he grimaced with palpation of his right shoulder. *Id.* at 38. An x-ray and ibuprofen were ordered. *Id.* A right shoulder x-ray performed on March 31, 2022, was normal. *Id.* at 300.

Petitioner saw Dr. Steffanides again on April 6, 2022. Ex. 9 at 86. Petitioner reported that he was having right shoulder pain again, and it was interfering with his sleep. *Id.* at 87. Ibuprofen and Tylenol were not helping much. *Id.* On examination, his right shoulder ROM was decreased and painful with motion over his head and behind his back. *Id.* Petitioner was given a trial of Medrol and advised to continue ice, heat, ibuprofen, and Tylenol. *Id.* at 87-88. The record states that Dr. Steffanides discussed Tramadol with the pharmacy and decided to try Medrol and other medications first. *Id.*

The next day (April 7, 2022), Petitioner submitted a HSR addressed to Dr. Steffanides. Ex. 9 at 1216. Petitioner noted that it was 4 A.M., and that he was in severe pain and sleep deprived due to pain. *Id.* He requested pain medication. *Id.* Petitioner was seen by a nurse on April 8, 2022, complaining of right shoulder pain at a level of three out of ten. *Id.* at 30-31. Medrol had helped a small amount with the pain, but the pain was worse at night. *Id.* at 31. Petitioner was upset as he thought Dr. Steffanides was ordering Tramadol but he had not received it. *Id.* at 31, 33. Petitioner was advised that his current plan of care was to continue the Medrol dose pack and other treatment, and that Tramadol could be considered if that was ineffective. *Id.* at 33.

On April 13, 2022, Petitioner saw a nurse to follow up on his shoulder pain. Ex. 9 at 26. Medrol had helped with the inflammation, but not the pain. *Id.* at 26, 29. He rated his pain as four out of ten. *Id.* at 27. He reported that in the morning his activities were limited due to stiffness, but at the present time he had no limitations. *Id.* at 28. On examination, his right shoulder had full ROM with abduction, adduction, lifting arms over head, and reaching behind his back. *Id.* at 29. His right shoulder was noted to be unremarkable, with no swelling or bruising and full ROM and strength. *Id.* The nurse consulted with Dr. Steffanides, who ordered Celebrex. *Id.* Petitioner was given a low bunk temporarily. *Id.*

Petitioner saw Dr. Steffanides the next month, on May 12, 2022. Ex. 9 at 84. Petitioner had stopped taking Celebrex after three weeks because it was not helping and he worried about side effects. *Id.* at 85. Flexeril helped his nighttime pain, but once he woke up he could not get back to sleep. *Id.* He described his pain as worse and constant. *Id.* Petitioner requested Tramadol for sleeping at night, but Dr. Steffanides did not think that was needed. *Id.* Dr. Steffanides offered a trial of meloxicam which could provide a

10-25% reduction in pain, but explained that nothing would take all the pain away. *Id.* They agreed on a Medrol dose pack, along with home exercises, ice, and heat. *Id.*

A month later (June 14, 2022), Petitioner returned to Dr. Steffanides to follow up on his right shoulder pain. Ex. 9 at 82. Petitioner stated that after the last ultrasound and steroid injection he felt he had torn something, and requested another ultrasound to see if anything has changed. *Id.* at 83. He was taking only Tylenol for pain as he did not want too many steroids or non-steroidal anti-inflammatory medications due to possible liver issues. *Id.* Medrol had helped, and a muscle relaxer provided some relief so he could sleep at night. *Id.* Dr. Steffanides determined the best course was to await an ultrasound of Petitioner's shoulder, possibly with an arthrogram because Petitioner could not have an MRI, and continued Flexeril for sleep along with Tylenol, ice, and heat. *Id.* Petitioner did not want any more PT as he did not feel it had helped, and stated he could not lift his arm to do the home exercises (although the record noted that as he left, he pushed the door open with his right hand). *Id.*

On December 2, 2022, Petitioner "refused to come out" of his cell for a nurse assessment, requesting instead to go to the emergency room for ongoing shoulder pain. Ex. 12 at 12. Petitioner was witnessed lying on his back talking, not moaning or groaning or showing evidence of severe pain. *Id.*

Petitioner submitted HSRs about his right shoulder pain on December 1, 2022, and January 8, 2023, respectively. Ex. 12 at 209, 223. He reported severe pain and stated that over the counter medications were not helping. *Id.* He saw Dr. Steffanides for his shoulder and diabetes on January 11, 2023. *Id.* at 14. He had stopped taking Meloxicam due to stomach upset. *Id.* Over the next month Petitioner continued to submit HSRs about his shoulder pain, requesting to see an offsite orthopedist. *Id.* at 193-195, 198.

On March 1, 2023, Petitioner saw orthopedist Dr. Molly Day for right shoulder pain and stiffness since his 2019 vaccination. Ex. 13 at 2. He had received two prior steroid injections and an MUA that helped "significantly for a short period of time," but he continued to struggle with pain and stiffness intermittently. *Id.* His pain and limited mobility made activities of daily living "nearly impossible." *Id.* He reported a pain level of eight out of ten. *Id.* at 4. On examination, his right shoulder ROM was 100 degrees in flexion and abduction and 30 degrees in external rotation. *Id.* at 3. He had positive results on the Hawkins impingement test. *Id.* Dr. Day assessed that Petitioner's symptoms were consistent with adhesive capsulitis, but stated that he did not have any symptoms consistent with a rotator cuff tear. *Id.* at 3-4. Dr. Day was sympathetic with his frustration, but explained that adhesive capsulitis is a self-limiting condition that gets better without surgery in nearly all cases. *Id.* at 4. Therefore, she recommended continued non-operative management. *Id.* She placed an order for an MRI, deferring to radiology as to

whether he was a candidate for an MRI. *Id.* She also ordered a fluoro guided glenohumeral joint injection and recommended that he work with PT on ROM. *Id.*

Petitioner underwent a right shoulder MRI on April 21, 2023. Ex. 14 at 2-3. The MRI showed a shallow partial-thickness tear of the supraspinatus with associated partial thickness tear of the anterior fibers of the infraspinatus tendon, along with thickening and increased signal of the supraspinatus tendon suggestive of tendinopathy. *Id.* Ten days later (May 1, 2023), Petitioner underwent a fluoroscopically guided glenohumeral joint steroid injection. *Id.* at 5-6. Petitioner saw Dr. Steffanides on May 17, 2023, reporting no complications and decreased pain following his recent steroid injection. Ex. 15 at 1. His shoulder was noted to have full ROM and full mobility. *Id.* Petitioner was advised to continue PT and ROM exercises. *Id.*

Petitioner had another PT evaluation for his right shoulder on May 24, 2023. Ex. 17 at 26. He reported a constant variable ache in his shoulder joint down into his deltoid ranging from four to ten out of ten. *Id.* at 27. On examination, his right shoulder active ROM was 170 degrees in flexion (compared to 180 on the left), 50 degrees in extension (compared to 53 on the left), 155 degrees in abduction (compared to 180 on the left), 66 degrees in external rotation (compared to 80 on the left), and 86 degrees in internal rotation (compared to 75 on the left). *Id.* at 28. The therapist noted he was "doing very well given his extensive [history]." *Id.* He had slightly lower strength ratings on the right side compared to the left, with pain. *Id.* Petitioner's active ROM was nearly within normal limits, with external rotation and abduction being areas with deficits. *Id.* He had functional strength levels as well, but with pain. *Id.* PT was established to set up a home exercise program for ROM and strengthening. *Id.*

Petitioner attended six additional PT sessions between May 31 and July 19, 2023. Ex 17 at 23-26, Ex. 18 at 16-17, Ex. 19 at 15-16. At his final session on July 19th, he was found to have full active ROM in his right shoulder and functional strength, with minor strength deficits, and was discharged from PT. Ex. 19 at 16. He was still reporting pain ranging from two to six out of ten, with pain on the lower end when resting and the higher end during or after exercises. *Id.*

The following month, on August 16, 2023, Petitioner saw orthopedist Dr. Brian Grogan about his right shoulder pain. Ex. 21 at 9. Petitioner reported that initially he had significant stiffness, but his ROM had returned and now he continued to have localized pain without radiation. *Id.* He had intermittently taken anti-inflammatory medications without significant relief. *Id.* His last injection about three months earlier lasted for a couple of weeks, but did not resolve all of his symptoms. *Id.* On examination, Petitioner had full ROM and strength in both shoulders, with painful palpation over the biceps tendon. *Id.* at 10. He had positive speed's and Yergason's tests but negative impingement testing, with

possible very mild pain with the Hawkins test. *Id.* Dr. Grogan assessed Petitioner with right shoulder biceps tendinitis versus impingement and a partial thickness rotator cuff tear. *Id.* He thought that Petitioner's symptoms might be from his biceps tendon rather than the partial rotator cuff tear, and ordered an interventional radiology injection of Petitioner's bicipital groove for both diagnostic and therapeutic purposes. *Id.* at 11. Dr. Grogan also provided naproxen and a PT referral. *Id.* He did not think that a shoulder arthroscopy would be beneficial without first locating the underlying pathology. *Id.*

Petitioner saw Dr. Steffanides later that month, on August 28, 2023, to follow up after his orthopedic consult. Ex. 22 at 9. Dr. Steffanides consulted interventional radiology and directed Petitioner to continue his home exercises. *Id.* at 10.

Petitioner submitted a HSR on November 16, 2023, inquiring whether his orthopedic appointment would take place by the end of the year. Ex. 24 at 60. He was told that the appointment had been scheduled, but for security reasons he could not be told whether it would occur by the end of the year. *Id.*

On December 7, 2023, Petitioner underwent an ultrasound guided right biceps tendon sheath steroid injection. Ex. 25 at 9. Prior to the procedure, he rated his pain as 4.5 out of ten; immediately after the injection he was pain-free. *Id.* No further treatment records have been filed.

## III.    Declarations

Petitioner has filed two declarations in support of his claim. Exs. 7, 8. He notes that he received the flu vaccine at the Redgranite Correctional Facility at an event in the gym. Ex. 7 at ¶ 2. Immediately after the needle was inserted, he felt severe pain that caused him to wince and look up at the nurse who administered the vaccine. *Id.* The nurse then said "Oops, my bad!" *Id.* As he walked away, his shoulder was burning "as if someone had held a cigarette lighter against my skin." *Id.* He expected the pain to subside with time, but unfortunately it did not. *Id.*

Later that day, he continued to feel burning at the injection site along with periodic "lightning bolt jolts of pain." Ex. 7 at ¶ 3. At that point, he realized that something was not right. *Id.* He was seen at the health unit a few hours later and given over the counter medication. *Id.* at ¶ 4. He tossed and turned that night and slept in a chair. *Id.* The next day, his shoulder was extremely sore and stiff when he awoke, with "excruciating pain" when he attempted to raise it. *Id.*

As the days passed, his condition worsened. Ex. 7 at ¶ 5. When he saw a nurse on December 19, 2019, he told her he was having difficulty getting into his upper bunk due to his right shoulder pain and mobility issues. *Id.* The nurse provided more over the counter pain medication and a sling. *Id.* Petitioner's request for a lower bunk

accommodation was denied. *Id.* at ¶ 6. That night, as he attempted to get into his top bunk while wearing the sling, he fell backward into a locker and desk, injuring his neck and back. *Id.* Approximately a week later, he again fell, this time while trying to exit his upper bunk wearing the sling. *Id.* at ¶ 7. This time he injured his right knee when it struck the metal ladder connected to the bunk bed. *Id.*

Since Petitioner's vaccine-related injury, his life has been altered for the worse. Ex. 7 at ¶ 8. He can no longer effectively work out in the gym, and states he cannot work due to his physical limitations. *Id.* He is right-handed, and thus has difficulty with daily tasks such as brushing his teeth and hair, showering, and hygiene related tasks. *Id.* This has left him "mentally and emotionally exhausted." *Id.*

## IV.    Other Evidence

### A.  Pain Management Group

Petitioner participated in an eight-week chronic pain management group between October and December 2023. Ex. 26. As part of the group, he recorded his daily shoulder pain and associated emotions. *Id.* For instance, in late October 2023, he rated his pain as between three and five out of ten and described it as a throbbing pain. *Id.* at 4, 6. The pain made him feel "despair" and "vulnerable." *Id.* at 6. The first week of November, he continued to experience a throbbing pain he rated as three out of ten, and it made him feel sad and angry. *Id.* at 8. The next week, his pain ratings remained the same and made him feel "helpless." *Id.* at 10.

In mid-November, he rated his pain as five out of ten and "throbbing." Ex. 26 at 12. He felt annoyed with the pain. *Id.* The following week, his pain was three out of ten and made him feel "depressed." *Id.* at 14. In late November to early December, he rated his pain two out of ten and felt optimistic. *Id.* at 16. After the December 7, 2023 biceps tendon steroid injection, Petitioner reported no pain for the following two weeks. *Id.* at 18-20.

### B.  Lost Wage Evidence

Petitioner filed a Department of Corrections Notice of Special Needs Committee Decision dated May 17, 2022. Ex. 23 at 9. The committee approved Petitioner's request for a low bunk for one year, with the modification of "No Rec, No Weight Room, No Work." *Id.* The decision has two handwritten sticky notes dated September 5, 2022, apparently written by Petitioner, stating that he was placed on a one-year loss of recreation and work because his arm required a low bunk. *Id.* Petitioner also filed a medical restrictions/special needs form listing "No Work" with a start date of April 13, 2022 and a stop date of May 2, 2023. *Id.* at 10.

Petitioner also filed an inmate assignment/removal form stating that his pay rate was $0.19 per hour, and that his work schedule totaled 40 hours per week. Ex. 23 at 1. It lists a job title of "Servery Worker 2." *Id.* This form has a start date of June 2, 2019 listed. However, the assignment status says "Termination – Administrative" as of October 10, 2019. *Id.*

## V.    The Parties' Arguments

Petitioner seeks $140,000.00 in pain and suffering, plus $1,514.93 for past lost wages.[7] Petitioner's Memorandum in Support of Damages, filed Oct. 24, 2023, at *22-36 (ECF No. 54) ("Mem."). Respondent argues that Petitioner should be awarded the lesser sum of $45,000.00 in pain and suffering, and that Petitioner has not preponderantly established entitlement to any award for past or future lost wages. Respondent's Response, filed Feb. 7, 2024, at *9-15 (ECF No. 57) ("Resp."). Petitioner replied in support of his damages brief. Petitioner's Reply, filed Feb. 28, 2024 (ECF No. 62) ("Reply").

### A.  Pain and Suffering

Petitioner argues that he is entitled to $140,000.00 in pain and suffering based on the severity and duration of his SIRVA. Mem. at *36. He describes this as "a net present value" including past and future pain and suffering (*id.*), although he does not break down how much of this is for past and how much is for future, or how he reduced the future amount to net present value. Petitioner notes that he complained of shoulder pain on the day of vaccination. *Id.* He underwent an MUA, four cortisone injections (including one which was fluoroscopically-guided and one guided by ultrasound), 18 PT sessions, one MRI, one ultrasound, two x-rays, and multiple off-site orthopedic specialist appointments over the course of nearly four years. *Id.* at *26; Reply at *12.

Petitioner further argues that his SIRVA has had an overwhelming effect on his quality of life. Mem. at *27. He submitted more than 45 HSRs reporting his ongoing right shoulder pain and requesting medical care over four years, many noting his depression and desire to alleviate his pain. *Id.* Due to his status as an inmate, he could not seek specialized care at his convenience, and offsite visits were scaled back due to the COVID-19 Pandemic, further delaying his ability to seek specialized care. *Id.* at *28. He experienced complications from his SIRVA, including two falls from his top bunk. *Id.* His initial requests for a low bunk were not granted. *Id.* For over three years after the onset of his SIRVA, his treaters thought he could not have an MRI due to metal within his body. *Id.* at 29. Ultimately, he was able to have an MRI. *Id.* And just days after his MUA under

---

[7] Initially, Petitioner also sought future lost earnings totaling $395.20. Mem. at *23. However, he later withdrew that request. Reply at *15.

anesthesia, he was placed on a restricted housing unit where he was unable to remove restraints outside of his cell, preventing his physical therapist from measuring his ROM. *Id.*

Petitioner cites *Selling*, *Rice-Hansen*, and *Bidlack*, other cases involving petitioners who underwent an MUA and were awarded pain and suffering of $105,000.00, $175,000.00, and $100,000.00, respectively, in support of his claimed award.[8] Petitioner argues he and the *Selling* petitioner both underwent an MUA and 18 PT sessions, but that Mr. Boyd's course was "significantly more severe" than the *Selling* petitioner's, with Mr. Boyd receiving one more cortisone injection, one which was fluoroscopically guided, as well as an additional interventional radiology injection of his bicipital groove. *Id.* at *30. Petitioner also argues his symptoms continued longer, for nearly four years versus 2.5 years in *Selling*. *Id.*

Petitioner states that he and the *Bidlack* petitioner both underwent an MUA and a comparable number of PT sessions, but argues that Petitioner's course was significantly more severe. Mem. at *31. The *Bidlack* petitioner received only two cortisone injections, and his pain continued for only 13 months– compared to Petitioner, who received four cortisone injections and whose symptoms continued for nearly four years. *Id.* at *31-32.

Petitioner acknowledges that the petitioner in *Rice-Hansen* underwent arthroscopic surgery in addition to an MUA – and thus more invasive care – in addition to more than twice as many PT sessions. Mem. at *31. But the *Rice-Hansen* petitioner underwent only one cortisone injection (compared to four for Petitioner), and experienced just over two years of pain, compared to nearly four years for Mr. Boyd. *Id.* Overall, however, Petitioner acknowledges that the objective markers of pain and suffering are more severe in *Rice-Hansen* than in this case, which he asserts is accounted for in his request for a lower award. *Id.*

Petitioner also relies on other SIRVA cases where symptoms continued for over three years - *Jahn*, *Smith*, and *Monson*, [9] involving pain and suffering awards of $135,000.00, $128,748.74, and $155,000.00, respectively.[10] Mem. at *33-35. Petitioner

---

[8] *Selling v. Sec'y of Health & Human Servs.*, No. 16-588V, 2019 WL 3425224 (Fed. Cl. Spec. Mstr. May 2, 2019); *Rice-Hansen v. Sec'y of Health & Human Servs.*, No. 20-1338V, 2022 WL 183339478 (Fed. Cl. Spec. Mstr. Dec. 9, 2022); and *Bidlack v. Sec'y of Health & Human Servs.*, No. 20-0093V, 2023 WL 2885332 (Fed. Cl. Spec. Mstr. March 6, 2023).

[9] *Jahn v. Sec'y of Health & Human Servs.*, No. 18-0613V, 2021 WL 6550870 (Fed. Cl. Spec. Mstr. Dec. 17, 2021); *Smith v. Sec'y of Health & Human Servs.*, No. 19-1384V, 2022 WL 3012509 (Fed. Cl. Spec. Mstr. June 29, 2022); and *Monson v. Sec'y of Health & Human Servs.*, No. 20-1350V, 2023 WL 2524059 (Fed. Cl. Spec. Mstr. Feb. 8, 2023).

[10] The *Smith* award included $125,000.00 for past pain and suffering and $3,748.74 for future pain and suffering.

asserts that he and the *Jahn* petitioner shared a comparable number of PT sessions and cortisone injections, and both experienced symptoms for over three years after vaccination, although the *Jahn* petitioner had a treatment gap of over two years. *Id.* at *33. Although the *Jahn* petitioner underwent surgery (compared to an MUA), Petitioner argues that the "objective markers of pain and suffering" are more severe in his case than in *Jahn*. *Id.*

Petitioner acknowledges that the *Smith* petitioner underwent surgery and additional PT sessions, but asserts that the *Smith* petitioner received only one steroid injection (compared to Petitioner's [four]) and had surgery only eight months after vaccination, while Petitioner's MUA took place nearly two years after vaccination. Mem. at *34. And Petitioner acknowledges that the *Monson* petitioner's case is more severe, involving surgery and significantly more PT sessions but a comparable duration of treatment. *Id.* at *34-35.

Respondent argues that Petitioner's injury was mild and time-limited, and argues that an award of $45,000.00 is reasonable, fair, and appropriate. Resp. at *9. Respondent disputes Petitioner's characterization of an injury continuing over four years. *Id.* at *10. Respondent (inaccurately) asserts that there was a nearly ten-month gap in care between June 23, 2020 and April 7, 2021 (Resp. at *5), and argues that "the significant gap in treatment breaks the causal chain and the objective evidence demonstrates at most six months of treatment."[11] *Id.* at *10. Thus, Respondent characterizes Petitioner's injury as involving "mild to moderate pain" and four PT sessions over a six-month period. *Id.* Respondent argues that Petitioner's MUA and steroid injections should not be included in his damages evaluation due to the purported ten-month gap in treatment. *Id.* at *11. Instead, Petitioner's damages should be based on his course of treatment from December 2019 through June 2020. *Id.* Respondent argues that Petitioner's pain was mild, and the treatment gap distinguishes his course of treatment from the MUA cases he cites. *Id.* at *12.

To support his preferred pain and suffering award, Respondent relies on *Ramos* and *Merwitz*, cases in which the petitioners were awarded $40,000.00 and $50,000.00, respectively.[12] Resp. at *13-14. If anything, Respondent reasons, Petitioner's case is less

---

[11] As Petitioner points out in his reply, he was seen by a nurse practitioner on November 23, 2020, for right shoulder pain, and submitted numerous HSRs during this alleged gap in treatment, but was told that the facility where he was incarcerated had scaled back offsite visits for non-acute conditions due to the Pandemic. Reply at *4-7.

[12] *Ramos v. Sec'y of Health & Human Servs.*, No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021); *Merwitz v. Sec'y of Health & Human Servs.*, No. 20-1141V, 2022 WL 17820768 (Fed. Cl. Spec. Mstr. Oct. 11, 2022).

severe in light of the *Ramos* petitioner's heightened pain, which he once rated ten out of ten. *Id.* at *13. And Respondent argues that Petitioner's treatment gap merits a reduction from the award in *Merwitz*. *Id.* at *13-14.

Petitioner takes issue with Respondent's assertion that Petitioner had a ten-month gap in treatment after June 2020. Reply at *4-7. Petitioner cites numerous HSRs he submitted during this time, and his November 23, 2020 consultation with a nurse practitioner for right shoulder pain (Ex. 2 at 721-722) to demonstrate that the suggestion that Petitioner had a ten month gap without complaints of shoulder pain is false. *Id.* Petitioner also disputes Respondent's assertion that Petitioner's August 23, 2021 appointment with Dr. Nelson occurred four months after his last shoulder complaint, pointing out that Petitioner submitted numerous HSRs, was seen by a nurse practitioner, and underwent a shoulder ultrasound during this timeframe. *Id.* at *7-9.

Petitioner further asserts that Respondent's argument that his MUA and steroid injections should not be included in his damages evaluation is based on the inaccurate premise that there was a ten-month treatment gap that "broke the causal chain." Reply at *10. In fact, Petitioner argues, the alleged ten-month gap "has no basis in reality, and is unsupported by the evidence." *Id.* at *11. Because Petitioner continued to complain of shoulder pain, and was seen and evaluated for it during this time, there is no "break" in the causal chain. *Id.* Rather, his treatment continued for four years. Reply at *11. In December 2023 (after he filed his damages memorandum), Petitioner underwent a fourth cortisone injection, and since that time has had a "significant recovery, reporting no further pain in his shoulder." *Id.* at *12. Petitioner argues that Respondent's cases are not on point. *Id.* at *12-14.

### B.  Past Lost Wages

Petitioner asserts that prior to his SIRVA, he worked full time at his correctional institution at a rate of $0.19 per hour. Mem. at *22. Because of his SIRVA, he was granted medical restriction, which he asserts means he was unable to work. *Id.* at *22-23. Although his medical restriction was not extended beyond May 2, 2023, Petitioner asserts he "has been unable to complete the tasks of a servery worker due to his ongoing symptoms." *Id.* at *23. He requests $1,514.93 in lost wages, which he explains represents 46 months – from December 2019 through late 2023 – of lost pay of 40 hours per week at $0.19 per hour. *Id.* He adds that his inability to work has negatively impacted his quality of life, explaining that any communication with friends or family costs money and his inability to earn wages prevents him from having funds for communication and other expenses. *Id.*

Respondent argues that Petitioner has not shown entitlement to any lost wages because there is no evidence of actual wage loss in the record. Resp. at *14. Petitioner bases his alleged inability to work on the approval of his special needs request for a low bunk. *Id.* However, there is no indication in the contemporaneous records that the low bunk restriction supports his assertion that he was unable to work as a result of his SIRVA. *Id.*

Petitioner replies that the medical restriction decision allowing him a low bunk specifically stated that he was unable to work. Reply at *15. Thus, he maintains his claim for past lost wages covering the period of December 2019 through December 2023. *Id.*

## VI.    Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section V.A-B of *Fritz v. Sec'y of Health & Human Servs.*, No. 21-2086V, 2024 WL 4349581, at *6-8 (Fed. Cl. Spec. Mstr. Aug. 29, 2024).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[13]

## VII.    Appropriate Compensation

### A. Pain and Suffering

Petitioner underwent an MUA, four steroid injections, approximately 18-20 sessions of PT,[14] an MRI, an ultrasound, and two x-rays. He treated with health care professionals in his correctional facility as well as offsite specialists. The records show

---

[13] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[14] It appears that the records indicate that Petitioner attended 20 PT sessions, but Petitioner asserts he attended 18 sessions. This minor difference would not alter my ruling herein.

that Petitioner persistently requested care, but encountered some delays in receiving treatment due to circumstances outside of his control.

I do not accept Respondent's argument that any sequela after June 2020 should be disregarded for damages purposes. Respondent's position is based on a misunderstanding of the facts. There was *not* in fact a ten month treatment gap between June 2020 and April 2021. Petitioner treated once, and unsuccessfully *sought* treatment numerous times, during that timeframe. As such, Respondent's cases involving treatment gaps are less useful. At most, Petitioner's case does have some similarities to *Merwitz*. Both Mr. Boyd and the *Merwitz* petitioner had minimal limitations in ROM, and similar amounts of PT. *Merwitz*, 2022 WL 17820768, at *4-5. However, Mr. Boyd's injury persisted for far longer, and he also underwent an MUA and three additional steroid injections.

At the same time, however, the record also shows that Petitioner's treaters sometimes noted inconsistencies when treating him. At a PT session in April 2020, for example, Petitioner initially had severe ROM restrictions – but only five days later he was found to have *full ROM* in flexion and abduction, leading the therapist to document the inconsistency as "[e]vidence of symptom magnification." Ex. 2 at 1071-1072. In addition, during a telemedicine visit six weeks before his MUA, Petitioner demonstrated severe restrictions in his right shoulder ROM in flexion and abduction. Ex. 9 at 231. However, during the MUA six weeks later, Dr. Nelson was able to *fully* flex Petitioner's shoulder once he was anesthetized, and noted only a small amount of stiffness and release of adhesions. *Id.* at 222. These seemingly anomalous exam findings, and the therapist's symptom magnification concern, lead me to give somewhat less weight to Petitioner's subjective descriptions of his pain levels to treaters, and to view the records pertaining to his ROM with some skepticism.

Taking all of the above into consideration, I find that the record best supports a finding that Petitioner experienced SIRVA symptoms for four years, but that for most of that time his symptoms were on the milder side. The treatment records suggest shoulder pain ranging from zero to nine, mostly on the lower side of the scale (especially since I cannot ascertain the reliability of Petitioner's self-reports of pain to treaters, for the reasons noted above). The records pertaining to ROM are similarly somewhat questionable. While some such evidence hints at moderate to severe restrictions in ROM, there are other records very close in time that find Petitioner had either full ROM or very minor deficits. Overall, the record best supports a finding that Petitioner had no more than minimal ROM restrictions.

Of the cases Petitioner cites, *Selling* provides the best comparable, even though it involved a more severe injury (albeit for a shorter time period). The *Selling* petitioner was

noted to have "severe and debilitating pain" between his vaccination and his MUA and was "unable to perform a number of basic tasks for several months." *Selling*, 2019 WL 3425224, at *6. His condition was compounded by the fact that he was the sole caregiver for his wife, who suffered from a disease causing very poor vision. *Id.* And he suffered sufficient trauma from his shoulder injury that he sought psychological help. *Id.* The *Selling* petitioner's injury resolved sooner than Mr. Boyd's, but Mr. Selling also continued his home exercises until he was completely pain free over two years after vaccination. *Id.* In contrast, Mr. Boyd was noted on several occasions not to have done his PT exercises outside of his formal sessions, suggesting that he did not do all he could to aid in his own recovery.

Overall, the facts relating to Petitioner's injury present the kind of uncommon circumstances in which a SIRVA injury requiring surgery should nevertheless not *quite* result in a six-figure pain and suffering award. Thus, after a careful review of the entire record, I find it best supports an award of $90.000.00 in pain and suffering.

### B. Past Lost Wages

The record does not support a finding that Petitioner is entitled to past lost wages. Petitioner has filed evidence suggesting that he was restricted from working from April 13, 2022 to May 2, 2023. Ex. 23 at 10. And he has filed evidence listing a pay rate and work schedule. *Id.* at 1. This evidence does suggest a loss of wages during one-quarter of the time period for which Petitioner seeks lost wages - but do not preponderantly establish it *even* for that time period. And there is *no* evidence that would support lost wages for the remaining years.

The document containing the pay rate and work schedule is from June 2019, and has an assignment status of "Termination – Administration," with an "as of" date of October 10, 2019. Ex. 23 at 1. It is not clear what this means, but a reasonable inference is that Petitioner was terminated in October 2019 – before the vaccination at issue. If this were the case, then the fact that he was placed on "No Work" status from April 2022 to May 2023 would have no meaning. And Petitioner has not submitted *any* evidence that would suggest that he incurred wage losses during the remaining time period for which he seeks compensation. As such, the lost wage claim is inadequately substantiated, and denied for that reason.

### Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $90,000.00 represents a fair and appropriate amount of**

**compensation for Petitioner's actual pain and suffering**.[15] I find that Petitioner has not established entitlement to lost wages by preponderant evidence.

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $90,000.00, in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[16]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[15] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[16] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.